IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Karen Lynn Browning,⁣     )   Civil Action No. 8:09-01793-PMD-BHH
            )
        Plaintiff, )
            )
     vs.        )
            )  **REPORT AND RECOMMENDATION**
Michael J. Astrue,       )  **OF MAGISTRATE JUDGE**
Commissioner of Social Security,   )
            )
        Defendant. )
_____ )

  This case is before the Court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, § 636(b)(1)(B).[1]

  The plaintiff, Karen Lynn Browning, brought this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g), 1383(c)(3)[2]), to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") regarding her claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act, as amended (the "Act").

## RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS

  The plaintiff was 44 years old on her alleged disability onset date. (R. at 37.) She initially alleged that she became disabled on April 1, 2002, due to tremor in her head and hands, foot problems, and a back injury. (R. at 141.) The ALJ found that she has a high school education and past work experience as a certified nursing assistant and babysitter. (R. at 37.)

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2] 42 U.S.C. § 1383(c)(3) "incorporates the review provisions of 42 U.S.C. § 405(g)." *Melkonyan v. Sullivan*, 501 U.S. 89, 92 (1991).

The plaintiff protectively filed applications for DIB and SSI on April 1, 2003 (R. at 120, 657),[3] which were denied in initial and reconsidered determinations (R. at 46, 48; 663, 664). She then requested a *de novo* hearing before an Administrative Law Judge ("ALJ") (R. at 129), which the ALJ held on June 9, 2006 (R. at 693.) In a decision dated July 19, 2006, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (*See* R. at 49.) On July 2, 2007, the Appeals Council granted the plaintiff's request for review of the ALJ's decision and remanded the case for further administratl've proceedings. (R. at 92.) The Appeals Council instructed the ALJ to associate for decision the plaintiff's DIB and SSI applications filed in October 2006. (R. at 93.)

The ALJ held a second hearing on December 20, 2007, at which the plaintiff, her attorney and a vocational expert ("VE") appeared. (R. at 732.) By decision dated March 25, 2008, the ALJ again found that the plaintiff was not disabled. (*See* R. at 17.) On May 15, 2009, the Appeals Council denied the plaintiff's request for a review (R. at 12), thereby making the ALJ's second decision the final decision of the Commissioner for purposes of judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.
>
> (2)     The claimant has not engaged in substantial gainful activity since April 1, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> (3)     The claimant has the following severe impairments: dysthymic disorder, generalized anxiety disorder; cognitive disorder, NOS; obesity; and degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

---

[3] There is no indication that the ALJ reopened the plaintiff's June 2002 DIB claim, which was denied at the initial level without appeal by the plaintiff. (*See* R. at 21, 162.)

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with restrictions that require simple, routine work; a supervised environment; no required interaction with the public or "team"-type interaction with co-workers; no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; only occasional stooping, twisting, crouching, kneeling, and climbing; only occasional crawling and balancing; and only occasional fine dexterity.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on April 29, 1957, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant is presently 50 years of age (20 CFR 404.1563 and 416.963).

(8)     The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

**APPLICABLE LAW**

The Act provides that DIB[4] shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Administration's official Listing of Impairments found at 20 C.F.R. part 404, subpart P, appendix 1,[5] (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920.[6] If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.*; *see also Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. Social Security Ruling (SSR) 82–61, *in Social Security Reporting Service: Rulings 1983-1991*, at 836 (West 1992). The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5)(a); *see also id.* § 1382c(a)(3)(H)(i). He must make a prima facie showing of disability by

---

[4] Eligibility requirements for SSI differ, *see* 42 U.S.C. § 1382, but are not an issue in the case *sub judice*.

[5] Although the listings are contained only in part 404, they are incorporated by reference into part 416 by 20 C.F.R. § 416.925.

[6] All of this Court's regulatory references are to the 2007 version of the Code of Federal Regulations (C.F.R.).

showing that he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.* at 191-92.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *see also Richardson v. Perales*, 402 U.S. 389 (1971). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing* U.S.C. § 405(g)*; Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

<u>DISCUSSION</u>

The plaintiff contends that the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in failing to properly (1) evaluate medical source opinions; and (2) assess the plaintiff's residual functional capacity ("RFC"). The Court will address each allegation in turn.

**I. Medical Source Opinions**

Administration regulations require that all medical opinions in a case be considered. 20 C.F.R. §§ 404.1527(b), 416.927(b). The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See id.* §§ 404.1527(d)(2), 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

A "medical opinion" is a "judgment[ ] about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions, but rather, are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 61 Fed. Reg. 34,471-01, 34,474 (July 2, 1996). Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary

decision, the Commissioner's findings must be affirmed if substantial evidence supports the decision. *See Blalock*, 483 F.2d at 775.

A. <u>Dr. Ron Paolini</u>. The plaintiff asserts that the ALJ erred in his assessment of her treating psychiatrist's opinion. Although the medical records do not extend that far back, the plaintiff indicated that she had been seeing Dr. Ron Paolini from 1998. (*See* R. at 143.) Together with the plaintiff's counselor, Kathy Rook, Dr. Paolini completed a "Mental Impairment Questionnaire" on the plaintiff's behalf in February 2005. (*See* R. at 425-30.) These providers opined that the plaintiff would be "unable to meet competitive standards" with regard to several criteria typically utilized by the Administration in determining a claimant's mental RFC. (*Compare* R. at 427, *with, e.g.*, R. at 395-96.)

These mental health providers also opined as to the "B criteria," finding the plaintiff to have "marked" restriction of her activities of daily living; suffer from "marked" difficulties in maintaining social functioning; have "extreme" difficulty in maintaining concentration, persistence, and pace; and have suffered three episodes of decompensation within a twelve month period.[7] (R. at 429; *cf.* R. at 409.) *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Dr. Paolini and Rook further believed that the plaintiff's mental impairments additionally met "C criteria," namely, had "resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."[8] (R. at 429; *cf.* R. at 410.)

---

[7] The listing for each mental disorder (other than mental retardation and substance addiction) consists of at least two parts: a set of clinical findings (paragraph A criteria) and a set of functional restrictions (paragraph B criteria). 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A § 12.00A. The ALJ first considers, under the A criteria, whether the claimant has a medically determinable mental impairment. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If yes, the ALJ must, under the B criteria, rate the degree of functional limitation resulting from the impairment. *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2).

[8] Listings 12.02, 12.03, 12.04, and 12.06 contain additional functional criteria (paragraph C criteria), which are assessed only if paragraph B criteria are not satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A § 12.00A. The C criteria chosen by Dr. Paolini and Rook is applicable to Listings 12.02, 12.03, and 12.04.

The ALJ determined that these opinions were not entitled to "great weight" (R. at 37), and the plaintiff objects to each reason he gave therefor. The ALJ decided that he found that the caregivers' "opinion and assessment cannot be relied upon to adequately assess the claimant's [RFC] in light of evidence that clearly shows that the claimant was noncompliant with taking her medications and with her treatment recommendations." (R. at 37.) The defendant concedes that "there was some debate as to the exact nature of Plaintiff's non-compliance with mental health treatment recommendations," but adds that "the most recent clarification on that issue showed that, at a minimum, Plaintiff refused to apply to anger or stress management techniques at home or during counseling sessions." (Def.'s Br. 22 (citing R. at 29, 462, 483).)

The plaintiff argues that the ALJ improperly relied on her noncompliance because he did not perform the required analysis before so doing. *See* SSR 82-59, *in Social Security Reporting Service: Rulings 1975-1982*, at 793, 793 (West 1983) [hereinafter *SSRS*]. The defendant responds that the ALJ did not use the plaintiff's noncompliance for this reason but, rather, in determining the plaintiff's credibility.

The Court disagrees. As set forth above, the ALJ relied on the plaintiff's noncompliance with regard to his evaluation of the treating caregivers' opinions. He explained: "Ms. Rook and Dr. Paolini confirmed in their treatment notes that the claimant was noncompliant. In fact, [the claimant] was discharged from treatment due to noncompliance." (R. at 37.) There is nothing in the ALJ's statements to indicate that, at this juncture, he was relying upon the plaintiff's noncompliance to support his credibility finding.

The regulations, however, state that, "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. § 404.1530(a); *see also id.* § 416.930(a). But Ruling 82-59 provides that, in

order to utilize this regulation, the Commissioner must first find all of the following conditions:

(1) the claimant's impairment(s) precludes engaging in any substantial gainful activity ("SGA");

(2) the impairment meets the durational requirement;[9]

(3) treatment clearly expected to restore capacity to engage in SGA has actually been prescribed by a treating source;

(4) the evidence establishes that there has been refusal to follow such prescribed treatment;

(5) failure to follow prescribed treatment was not justifiable.

*SSRS, supra,* at 793; *see also Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985) (holding that, if noncompliance is to be relied upon, the Commissioner must establish "that the claimant's impairment 'is reasonably remediable by the particular individual involved, given ... her social or psychological situation'").  As alleged by the plaintiff, the ALJ did not engage in this process.

Further, as the plaintiff also suggests, her mental impairment could be the reason that she did not follow Rook's instructions that she engage in calming behaviors and use stress and anger management techniques.  *Cf.* 20 C.F.R. §§ 404.1530(c), 416.930(c) ("We will consider your [mental limitations] when determining if you have an acceptable reason for failure to follow prescribed treatment.").  The caregivers' questionnaire indicates that the plaintiff has great difficulty dealing with stress; with understanding, remembering and carrying out instructions; and with maintaining "socially appropriate behavior." (R. at 427-28.)  They additionally opined that the plaintiff had "extreme" difficulty in maintaining

---

[9] "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.  We call this the duration requirement."  20 C.F.R. §§ 404.1509, 416.909.

concentration and persistence.  (R. at 429.)  And "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citation omitted; alteration in original); *see also* cases cited therein.  Remand allows further development of the issue of the plaintiff's noncompliance with her treatment regimen.

The plaintiff complains that the ALJ also erred in relying on "the opinions of other medical sources who found the claimant was generally only moderately impaired in her ability to function."  (R. at 37.)  There are several "medical source" opinions in the record concerning the plaintiff's mental functioning, and the ALJ does not here indicate on which he relies.  The defendant refers to the opinion of John Bradley, Ph.D., who evaluated the plaintiff four times from 1995 through 2007, but to whose opinion the ALJ failed to accord "great weight."  (R. at 36.)

Dr. Bradley wrote that the results of the plaintiff's Wechsler Memory Scale test indicate that she has very poor memory functions.  (R. at 560.)  During the evaluation, the plaintiff was difficult to keep focused.  (R. at 562.)  She digressed a great deal and, at times, was difficult to follow.  (R. at 563.)  The plaintiff admitted to suicidal thoughts and exhibited tangential thinking.

Dr. Bradley found the plaintiff's attention and concentration skills to be below normal.  Both her judgment and insight appeared poor.  The doctor concluded that it was "very doubtful that [the plaintiff] could be gainfully employed for any length of time in any but the simplest of jobs such as babysitting."  (R. at 564.)  At the end of previous evaluations performed in connection with her disability claims, Dr. Bradley opined, "It is very doubtful that she could be gainfully employed for any length of time currently."  (R. at 320 (11/03); 361 (4/04).)

Robert Gemmill, LCSW, conducted five therapy sessions with the plaintiff over the course of four months in 2003.[10] (*See* R. at 304-15.) Upon discharge, he recommended that she apply for Social Security disability benefits. (R. at 306.) A form from the Margaret J. Weston Medical Center (the "Weston Center"), where the plaintiff received care starting May 2006, indicated that the plaintiff's depression and anxiety caused her to exhibit "severe" work-related limitation in functioning. (R. at 485.)

In July 2006, the plaintiff began therapy with psychiatrist David Steiner, seeing him bi-monthly.[11] A year later, he wrote that the plaintiff had difficulty with focusing, concentrating, and maintaining an adequate pace, and that her anxiety and depression would "significantly interfere with her ability to function in a work-related environment." (R. at 685.) Just after the plaintiff's second hearing, Dr. Steiner wrote a second letter listing even more symptoms, and opining that they would "interfere with her ability to form meaningful relationships and to work." (R. at 686.)

Secondarily, physical evaluators voiced concern regarding the plaintiff's psychological condition. A vocational expert expressed concern about the plaintiff's "personal presentation and the associated, interactive effects." (R. at 199.) He explained:

> I maintain a number of reservations regarding [the plaintiff]'s presentation and the related impact of her perceived psycho-vocational status. Based upon my [4 hours] with her, I would not expect her to experience great success in her job search effort unless she is successful in mitigating a number of adverse issues. . . .
> It may be of benefit to consult with Dr. Paolini with regards to the nature of [the plaintiff']s emotional symptoms[.]

(R. at 200.)

The physician who examined the plaintiff at the state agency's request concluded that the plaintiff's physical complaints would not preclude employment, but added, "[I]t is her

---

[10] The ALJ did not address Gemmill's records.

[11] The ALJ did not discuss Dr. Steiner's records.

psychopathology that is immediately strikingly apparent. I suspect that a personality disorder numbers among her diagnoses." (R. at 601.) Overall, the opinions of those who have treated and examined the plaintiff indicate more than just moderate limitations from psychological symptoms. The defendant argues that the state agency consultants all determined that the plaintiff could perform work, but the Administration generally gives more weight to the opinion of an examining source. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

The plaintiff further challenges the ALJ's citation to her GAF scores, which Dr. Paolini and Rook generally assessed from 51 to 60.[12] The ALJ rightly determined that these scores indicate that the plaintiff's symptoms "were mild to moderate in nature." (R. at 37.) But the Administration has advised that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50,746-01, 50,764-765 (Aug. 21, 2000).

Moreover, the GAF score, standing alone, is of little significance to the factfinder, as there is no indication of whether it applies to symptom severity or level of functioning, or impairment in reality testing or communication, or major impairment in several areas and, if in several areas, which areas, and if these areas impact basic work activities. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000) (describing how the scale is to be used, e.g., the score reflecting the worse of symptom severity and functioning level). Thus, for Social Security disability purposes, a GAF rating is simply another observation which presumably is subsumed into the medical

---

[12] "GAF" – "Global Assessment of Functioning" – ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000) [hereinafter *DSM-IV-TR*]. A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

source's final assessment. In light of the insubstantiality of the other evidence relied upon by the ALJ to discredit Dr. Paolini's and Rook's opinions, their GAF scores do not adequately support his weighting.

The ALJ also relied upon his discussion of the plaintiff's daily activities, as follows:

> The evidence shows the claimant has been able to drive short distances, grocery shop on busy days like Saturday without assistance, attend church, read, make simple meals such as sandwiches, attend singles Bible study, and manager[sic] her own money. She can maintain her personal hygiene and dress without assistance. Furthermore, the claimant has been baby-sitting regularly for a number of years for children whose ages range from six months to nine years of age.

(R. at 33-34.) Yet, many concurrent medical records indicate that the ALJ is overstating the plaintiff's abilities. The plaintiff told Gemmill that she was not active in church. (R. at 309.) In January 2004, law enforcement took the plaintiff to the hospital for a psychiatric evaluation after a public altercation with her husband. (R. at 514.) The following month, Dr. Paolini described the plaintiff as very anxious, very upset, "quite frustrated and upset," with memory lapses, and "truly . . . unable to work in any capacity at this time." (R. at 349.)

In December of that year, Dr. Paolini observed that the plaintiff was "not really doing much in the way of better," and stated that "[h]er ability to be employed seems little to none." (R. at 432.) The following month, Rook made a single notation that the plaintiff was to attend a "singles bible study" that night. (R. at 431.) That February, on the Mental Impairment Questionnaire, the caregivers noted the plaintiff's murder and torture fantasies; that she "stalked" her ex-husband; that the plaintiff stole and went through her ex-husband's garbage; that the plaintiff was arrested at 4 a.m. for "hostile & profane phone call." (R. at 427; *see also* R. at 477.) The plaintiff admitted that, during this period, her ex-husband's ex-wife attempted to place a restraining order on the plaintiff. (R. at 691.)

In September 2005, while discussing the prescribing of a third medication, Dr. Paolini remarked that "none of our other endeavors have proven very helpful with her." (R. at 470.) With regard to her babysitting work, the plaintiff stated that the work was not steady, and

13

there were times when she had no clients at all. (R. at 690.) In December, Dr. Paolini believed that the plaintiff "continues to try and do the best she can," but the plaintiff reported that her baby-sitting was "drying up"; they again discussed her applying for disability. (R. at 468.)

Later in December 2005, the plaintiff physically assaulted her brother. (*See* R. at 465, 467, 691.) To help control her impulsivity and rage, Dr. Paolini added Seroquel to her three prescriptions, but warned the plaintiff that it could worsen her familial essential tremor.[13] (R. at 465.) In February 2006, Rook reported that the plaintiff was expressing "ongoing passive suicidal ideation" and leaving "rambling phone messages." (R. at 467.) In developing the plaintiff's "Plan of Care" later that month, Rook explained, "Due to the seriousness of the diagnosis, the length of time symptoms have been experienced and the poor progress to date, long term affiliation is anticipated." (R. at 461.) By May, the counselor described the plaintiff working herself "into a rage, with shouting and pounding the table or chair with her fist."[14] (R. at 462.) And at the end of May, Rook ended the plaintiff's treatment, explaining that she "did not get better," and assessing her GAF at 50.[15]

The plaintiff began seeing Dr. Steiner in July 2006, and told him that, on some days, she did not leave the house. (R. at 557.) In September, the plaintiff reported that she was "trying" to be involved with church functions. (R. at 556.) At her November visit, the plaintiff said that she was more depressed and could not get out of bed. (R. at 632.) A year after her first appointment, Dr. Steiner stated that the plaintiff "has been tried on multiple

---

[13] The plaintiff later reported that she only discontinued medications when they made her tremors worse. (R. at 691.)

[14] A consultative examiner noted similar behavior in January 2007: "She is very verbal, at times escalates to a shout. ... She is very difficult to interrupt and several times I had to raise my voice to make her stop talking." (R. at 599.)

[15] A score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR, supra* note 12, at 34.

14

antidepressants and other mood stabilizers with some efficacy but her symptoms continue to return." (R. at 685.)

Later that month, however, the plaintiff reported that she was babysitting "most everyday." (R. at 571.) Psychiatrist Gregory Smith observed that her medication regimen appeared to be "working reasonably well for her over the last little while," although the plaintiff still complained of short-term memory deficits. (*Id.*) The plaintiff still did not "get out and do much more." (*Id.*) Dr. Smith deemed her depression and anxiety "to be under fair control with treatment."[16] (R. at 572.)

As to managing her money, the plaintiff has never professed to being able to do so. On a 2003 questionnaire, she answered that her ex-husband and workers' compensation handled her financial responsibilities. (R. at 167.) In 2004, the plaintiff stated: "I can't add checkbook. Have had lights turned off because did not remember." (R. at 180.) In 2006 she said, "I can't [balance] a checkbook. I call for balance to the bank." (R. at 222.) Contrary to the ALJ's conclusion, the plaintiff's minimal daily activities do not contradict Dr. Paolini's and Rook's opinions. *Cf.* 20 C.F.R. pt. 404, subpt. P., app. 1, § 12.00C1 (providing that even "a wide range of activities" does not foreclose finding a marked limitation if not performed "on a consistent, useful, routine basis, or without undue interruptions or distractions"); *Totten v. Califano*, 624 F.2d 10, 11 (4th Cir. 1980) ("An individual does not have to be totally helpless or bedridden in order to be found disabled under the Social Security Act[.]").

---

[16] "[O]ne characteristic of mental illness is the presence of occasional symptom-free periods." *Poulin v. Bowen*, 817 F.2d 865, 875 (D.C. Cir. 1987). Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim. *Id.* Unlike many physical impairments, it is extremely difficult to predict the course of mental illness. *Id.* Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse. *Id.*

*Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996).

The Court wishes to stress that it is *not* re-weighing the evidence but, rather, reviewing the record in order to establish that the ALJ's reasoning is supported by substantial evidence. *Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985) (the district court "review[s] the Secretary's findings for support by substantial evidence; '[t]his Court does not find facts or try the case de novo when reviewing disability determinations.'" (citations omitted; second alteration in original)). But "[t]he deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006); *see also Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (holding that, to determine whether substantial evidence exists, the court must not only "consider evidence in the record that supports the Commissioner's determination, but also any evidence that detracts from that conclusion"). The Court takes issue with the ALJ's reasoning in that he appears to focus on such evidence that supports his decision and then inflates that evidence such that it is more supportive. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (noting that ALJ may not "select and discuss only that evidence that favors his ultimate conclusion").

The plaintiff further asserts that the ALJ should adhere to Ruling 96-2p, 61 Fed. Reg. 34,490-01 (July 2, 1996), which advises,

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at 34,491. *See also* SSR 96-5p, 61 Fed. Reg. 34,471-01, 34,473 (July 2, 1996) ("Adjudicators must weigh medical source statements under the rules set out in 20 CFR 404.1527 and 416.927[.]"). And the plaintiff is correct. Given the above analysis of the

ALJ's reasoning, the Court deems it prudent to remand the plaintiff's case for the ALJ to perform the regulatory analysis[17] of Dr. Paolini's and Rook's opinions.

B. <u>Dr. Susan Tankersley</u>.  The plaintiff complains of the ALJ's failure to find that she had limitations as suggested by Dr. Susan Tankersley, a consultative examiner.  The doctor's findings include that the plaintiff's upper extremities had normal sensorium, strength, and range of motion.  (R. at 600.)  Her muscle mass was symmetric and her tone was normal. Dr. Tankersley added:

> [The plaintiff] can do finger-to-nose and rapid alternating hands test bilaterally with may be [sic] some minimal dysmetria[18] on the right.  She has some fine titubation[19] . . . .  She has a fine resting tremor in both hands, which worsens on position and intention.  However, there are several times during the interview, when she is relatively calm, that she has no tremor at all on rest.

---

[17] The regulations set out factors we consider in weighing medical opinions from treating sources, nontreating sources, and nonexamining sources.  See 20 CFR 404.1527(d) and 416.927(d).  These factors include:

• The examining relationship between the individual and the "acceptable medical source";
• The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
• The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
• How consistent the medical opinion is with the record as a whole;
• Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
• Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion.

SSR 06-03p, 71 Fed. Reg. 45,593-03, 45,595 (Aug. 9, 2006).  Contrary to the defendant's suggestion, the Court is not remanding "so that the ALJ [can] state that he was not assigning the opinions 'controlling weight'" (Def.'s Br. 25), but rather, so that the ALJ can perform a proper assessment of opinions that he deemed entitled to less than controlling weight.

[18] "An aspect of ataxia, in which the ability to control the distance, power, and speed of an act is impaired." *Stedman's Medical Dictionary* 553 (27th ed. 2000).

[19] "A tremor or shaking of the head, of cerebellar origin."  *Stedman's Medical Dictionary*, *supra* note 17, at 1839.

17

(*Id.* (footnotes added).)   The doctor concluded that the plaintiff "does have tremor that impact[s] her fine motor skills and probably will limit employment in those fields that require fine motor skills or *prolonged bi-manual manipulation.*" (*Id.* (emphasis added).)

The ALJ discussed Dr. Tankersley's findings and conclusions.  (R. at 33.)  Although he did not specifically address the doctor's opinions, he did summarize the treatment the plaintiff sought for her tremors.  The ALJ also noted that neurologist Melvyn Haas found the plaintiff's finger-to-nose testing to be normal, but that "[a]lternating movements of the hands was somewhat clumsy" bilaterally.  (R. at 31; *see also* R. at 455.)

The ALJ next discussed the plaintiff's treatment by a second neurologist.  (R. at 31.)  Dr. Richard Eisenberg observed that the plaintiff had no resting tremor or cogwheel rigidity but did have moderate postural tremor with outstretched hands.  (R. at 538.)  Further, the plaintiff's upper extremities showed no focal weakness and had intact sensation, and she could perform finger-to-nose testing.  The plaintiff returned two months later, but prescribed medication had not helped.  (R. at 536.)  Dr. Eisenberg increased the plaintiff's dosage, but she did not return for a follow-up visit.

The ALJ noted that the plaintiff thereafter returned to Dr. Haas, who observed that her tremor had worsened.  (R. at 31; *see also* R. at 446.)  Dr. Haas prescribed Topamax but, at the plaintiff's follow-up the next month, she explained that, although helpful, she could not afford the drug.  (R. at 441.)  The plaintiff returned in June, and Dr. Haas prescribed a second drug and planned again to see the plaintiff.  (R. at 440.)  The plaintiff failed to show for her next appointment and, by letter dated June 26, 2006, Dr. Haas informed the plaintiff that he would no longer provide care to her as she failed to keep her appointments.  (R. at 533.)  The ALJ additionally noted a state agency physician's opinion that the plaintiff was limited in fingering but had no gross manipulation limitations (R. at 33); he gave "considerable" weight to the state agency opinions (R. at 36).

The ALJ explained why he did not find the plaintiff's tremor to be "severe"[20]:

[A]n EEG, head MRI, brain stem evoked response were normal. . . . As to her tremors, the evidence reveals that she has normal finger to nose testing, that she had no focal weakness of the upper or lower extremities, and that sensory exams were normal limits. The evidence demonstrates that the claimant failed to follow up with physicians who were treating her tremors. The records also reflect that the claimant's tremors were helped when she took medication [R. at 440-56]. Although her tremors may result in some limitations in her ability to perform fine dexterity, it generally has little, if any, effect on her ability to perform gross manipulation with her upper extremities.

(R. at 23.) The defendant posits that the ALJ "reasonably considered the evidence in concluding that Plaintiff's tremors limited her to no more than occasional fine dexterity" (Def.'s Br. at 26), but the Court disagrees.

The ALJ stated that the plaintiff had normal finger-to-nose testing, but Dr. Haas thrice qualified this finding. (R. at 455 (7/02 testing "otherwise normal"); 446 (2/05 testing normal "aside from the tremor"); 441 (4/05 testing "otherwise normal").) No physician ever discounted the plaintiff's tremors because of the lack of findings on objective studies. The ALJ cited findings regarding strength and sensation, but the plaintiff did not associate these with her tremor-related difficulties. Rather, she testified that she had difficulty at times with activities such as writing, lifting (not because of weight), dialing a telephone, using a calculator, preparing meals, and some personal care. (R. at 702, 703, 722, 744; *see also* R. at 455 ("too clumsy to operate a computer"); 482 ("difficulty performing any activity requiring dexterity").) The ALJ did not specify just which of the plaintiff's daily activities demonstrated that she could engage in "prolonged bimanual manipulation."[21]

---

[20] "[A]n impairment(s) that is 'not severe' must be a slight abnormality ... that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 61 Fed. Reg. 34,468-01, 34,469 (July 2, 1996).

[21] As pointed out by the plaintiff, the VE testified that "most of the jobs that would conform to the [ALJ]'s hypothetical are production oriented type jobs where fairly good bimanual gross dexterity is going to be required *on a sustained basis.*" (R. at 753 (emphasis added).) The opinion of a VE is only helpful if it is delivered "in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It is not the "gross dexterity" of the response that calls into question the ALJ's reliance on the VE's testimony, but rather the "sustained basis" which conflicts with Dr. Tankersley's opinion.

Dr. Haas described the plaintiff's tremors as "prominent" (R. at 440, 441), and her hand movements as "slow and clumsy on either side" (R. at 446). He explained that "[c]lumsiness is common with this disorder." (R. at 456.) Dr. Haas reported that the tremors had worsened in 2002 (R. at 454), and worsened again in 2005 (R. at 446).

The ALJ points out that the plaintiff failed consistently to follow-up with her providers, but he did not ask her to explain why. The Administration's Ruling warns that

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

SSR 96-7p, 61 Fed. Reg. 34,483-01, 34,487 (July 2, 1996). As SSR 96-7p suggests, *id.*, the plaintiff lost her health insurance after her divorce from her second husband, and she "was not able to see the doctors that [she] would have like[d] to have seen." (R. at 721.) Further, the plaintiff sought help from family practitioner H. G. Royal, Jr. (R. at 540), and the Weston Center (R. at 589), after her treatment by Dr. Haas.

When stating that medication helped the plaintiff's tremors, the Court assumes that the ALJ is referring to her trial of Topamax. But when the plaintiff told Dr. Haas that the drug "helped some," she added that she could not afford it. (R. at 441.) The doctor attempted to get her indigent assistance, but without success. (*See* R. at 440.) Overall, the Court finds that the ALJ failed to provide substantial evidence to support his decision to favor the opinion of the state agency physician over that of Dr. Tankersley. *Cf. Millner v. Schweiker*, 725 F.2d 243, 246 (4th Cir. 1984) ("Since the only report in the record purporting to support the ALJ's finding ... is that of a non-examining, non-treating physician and that report is contradicted by direct testimony by the claimant and by medical diagnoses made by

examining and treating physicians, a finding based on so slender a reed was simply not supported by substantial evidence." (footnote omitted)).

C. <u>John Bradley, Ph.D.</u>  The plaintiff next claims error with the ALJ's evaluation of Dr. Bradley's opinions.  The ALJ explained:

> Dr. Bradley's opinion appears to be based largely on the claimant's subjective complaints.  His opinion also indicated that her limitations were for that particular point in time, and he did not state that her limitations were permanent.  Also, Dr. Bradley stated it was "doubtful" that she could be employed at the "current" time, which indicates his opinion was not to any degree of certainty.  Additionally, the evidence shows the claimant was not compliant with her mental health treatment, but that when she was compliant, she had improvement in her symptoms.  Therefore, I do not give Dr. Bradley's opinion great weight.

(R. at 36.)

Again, the ALJ's decision is not sufficiently supported.  He does not show how Dr. Bradley's opinion was based on the plaintiff's subjective complaints.  The Court finds persuasive the view expressed by the Tenth Circuit Court of Appeals:

> The ALJ also erred in discounting the treating psychologist's opinion for lack of clinical findings based on psychological tests.  There is no "dipstick" test for disabling depression.  *See Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993).  The accepted clinical technique for diagnosing such an impairment is to assess the existence and severity of symptoms and signs identified by the American Psychiatric Association in the *DSM-IV*.[22]  *See DSM-IV* at xxii-xxiv, 1-9.  This assessment is usually based on a patient's subjective reports and the psychologist's own observations.  Although psychological tests may be used in evaluating a patient, they do not produce laboratory-type results, instead requiring interpretation of the patient's responses.  The 1997 regulations specified that a psychological opinion could rest either on observed signs and symptoms or

---

[22] *See supra* note 12.

21

on psychological tests.[23]  *See* 20 C.F.R. [Pt. 404,] Subpart P, App. 1 § 12.00B (1997).

*Schwarz v. Barnhart*, 70 F. App'x 512, 518 (10th Cir. 2003) (footnotes added); *see also Poulin v. Bowen*, 817 F.2d 865, 874 (D.C. Cir. 1987) ("'The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation[.]'" (citation omitted)).  Accordingly, in addition to interviewing the plaintiff, at each examination, Dr. Bradley conducted a mental status examination.[24]  (R. at 319-20; 357-58; 562-63; 565-66.)

Moreover, there is no regulatory requirement that a medical source indicate that a claimant's condition is "permanent"; indeed, a claimant need be "disabled" for only twelve months to qualify for benefits.  *See supra* note 9.  The regulations even provide that a claimant who is awarded benefits may be re-evaluated in order to determine if improvement has occurred such that the claimant is no longer disabled.  *See* 20 C.F.R. §§ 404.1589-.1590, 416.989-.990.

The ALJ discounted the opinion because Dr. Bradley was only "doubtful" that the plaintiff could be employed, but such an opinion is not a "medical opinion," but an opinion on an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

---

[23]  The 2007 regulations did likewise:

> We must establish the existence of a medically determinable impairment(s) of the required duration by medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings).  Symptoms are your own description of your physical or mental impairment(s).  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source.  Symptoms and signs generally cluster together to constitute recognizable mental disorders described in the listings.  The symptoms and signs may be intermittent or continuous depending on the nature of the disorder.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B.

[24]  "A mental status examination (MSE) is a medical process where a clinician working in the field of mental health ... systematically examines a patient's mind.  Each area of function is considered separately under categories in a way similar to a physical examination performed by physicians."  *Pate-Fires v. Astrue*, 564 F.3d 935, 946 n.6 (8th Cir. 2009).

22

The issue of the plaintiff's mental health treatment compliance has already been addressed, *see supra* pp. 8-9. Further, the ALJ did not specify on what occasions and under what conditions the plaintiff experienced improvement.[25]  *See id.*

D.  <u>State Agency Psychologists</u>.  The plaintiff points out that the ALJ gave "considerable weigh[t]" to the opinions of the state agency experts, yet he failed to adopt a restriction to low-stress work.  Lisa Smith Klohn, Ph.D., performed her review and assessment in December 2003, before treatment records indicated a worsening of the plaintiff's symptoms as indicated by a decrease in GAF and change in diagnosis.[26] (*Compare* R. at 351, *with* R. at 349.)  Dr. Klohn did not suggest any stress-related restrictions.  (*See* R. at 395-97.)

When Edward Waller, Ph.D., evaluated the plaintiff's records in May 2004, he stated that the plaintiff "would need a low stress job setting."  (R. at 368.)  Samuel Goots, in February 2007, also believed that the plaintiff would require a low-stress work setting.  (R. at 628.)  The plaintiff's case returned to Dr. Waller in August 2007, at which time he opined that the plaintiff "would perform better in a low stress job."  (R. at 651.)  Given the differences in the opinions to which the ALJ accorded "great weight," the Court concludes that his decision is not substantially supported absent further explanation.  *See Gordon v. Schweiker*,  725 F.2d 231, 235 (4th Cir. 1984) (remanding for explanation of weight given when ALJ chose between conflicting opinions); *see also Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987) ("In the face of such a sharp division in medical evidence, it is simply

---

[25] As discussed at pages 8-9, *supra*, mere "improvement" does not justify a reliance upon non-compliance.

[26]  The ALJ found the plaintiff's dysthymic disorder to be severe (R. at 23), but in December 2004, Dr. Paolini added superimposed major depressive disorder ("MDD") to the plaintiff's diagnosis of dysthymic disorder.  (R. at 432.) Rook's records, which begin in December 2004, carry diagnoses of dysthmia *and* MDD. (*See, e.g.*, R. at 424, 434).  However, at discharge, she changed the diagnosis to "Superimposed [MDD] with questionable psychotic features." (R. at 458).  When Dr. Steiner assumed the plaintiff's mental health care in July 2006, he included major depression, recurrent/severe, among the diagnoses. (R. at 558.)  According to the *DSM-IV-TR*, *supra* note 12, dysthymic disorder "is characterized by chronic, *less severe* symptoms [than MDD] that have been present for many years." *Id.* at 374 (emphasis added).

unacceptable for the ALJ to adopt one diagnosis over another without addressing the underlying conflict.").

## II. RFC

The plaintiff argues that the ALJ erred in that he did not express her mental impairments in terms of work-related functions as required by SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996), which governs the assessment of RFC. The Ruling provides that work-related mental activities "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* at 34,477. The ALJ found that the plaintiff could "make simple decisions" (R. at 34); perform simple and routine work; in a supervised environment; with no interaction with the public and no "team-type" interaction with her co-workers (R. at 36). The Court agrees with the plaintiff, however, to the extent that the ALJ did not address how she would deal with changes at work, i.e., how the plaintiff would handle stressors.

The plaintiff also complains that the ALJ did not provide the narrative discussion required by SSR 96-8p, describing how the evidence supports each conclusion, with citation to specific facts. 61 Fed. Reg. at 34,478. But the ALJ cited to the plaintiff's daily activities as proof that "she is capable of sustaining attention and concentration to complete at least simple, routine tasks." (R. at 34.) He further referred to the opinions of the state agency experts (R. at 33), discussed hereinabove. Although the ALJ adopted the experts' opinions that the plaintiff should not have interaction with the public, he opined otherwise: based on the plaintiff's ability to "grocery shop on busy days like Saturday without assistance," the ALJ found that the plaintiff was "able to maintain appropriate behavior when around other people." (R. at 33-34.) And the ALJ relied on the plaintiff's babysitting activities to find that she could "handl[e] significant responsibility." (R. at 33, 34.)

The plaintiff further cites to SSR 96-8p's requirement that the factfinder discuss the claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis," i.e., on a full-time basis. 61 Fed. Reg. at 34,478. The ALJ did not provide a basis for finding that the plaintiff could work full-time. *Cf. Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006) (under SSR 96-8p, in finding that plaintiff had the RFC to perform work, the ALJ implicitly found he could perform sustained work). The plaintiff's testimony regarding babysitting (two children, four to five days per week, for eight and one-half hours per day (R. at 747, 750)), could lend some support to such a finding. But the plaintiff's babysitting duties did not comport with the ALJ's RFC finding. (*See, e.g.*, R. at 229, 746-49, 751 (VE's testimony).) Further, the state agency determined that the plaintiff's babysitting services did not constitute SGA. (R. at 232.) *Cf.* 20 C.F.R. §§ 404.1574- .1575, 416.974-.975. Accordingly, the ALJ failed to support his finding that the plaintiff could engage in light work on a sustained basis.

The plaintiff lastly cites to the requirement from SSR 96-8p that the RFC assessment "include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." 61 Fed. Reg. at 34,478. As discussed above, the ALJ *did* explain why he did not accept Dr. Tankersley's opinion regarding the plaintiff's tremor, but the Court has found this explanation inadequate. The ALJ did *not* explain why he did not accept the opinion proffered by three of four experts that the plaintiff should be restricted to low-stress work. Upon remand, if the ALJ finds that the plaintiff is not disabled, he should incorporate any findings which result from his re-examination of the medical source opinions into a narrative discussion that complies with SSR 96-8p.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, the Court cannot conclude that the ALJ's decision to deny benefits was supported by substantial evidence. It is, therefore, RECOMMENDED, for the

foregoing reasons, that the Commissioner's decision be reversed and remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings as set forth above.  *See Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

        IT IS SO RECOMMENDED.

s/Bruce H. Hendricks\
BRUCE H. HENDRICKS\
UNITED STATES MAGISTRATE JUDGE

July 30, 2010\
Greenville, South Carolina